UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PATRICIA JUANITA WATE,
INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF JAMES CLIFTON BARNES,
DECEASED,

        Plaintiff,

v.                       Case No. 8:14-cv-1196-T-33TBM

JOSEPH TACTUK, ET AL.,

        Defendants.
_____/

**<u>ORDER</u>**

This cause comes before the Court pursuant to Defendant Kenneth Kubler's Motion to Dismiss (Doc. # 34) and Defendant Bob Gualtieri's[1] Motion to Dismiss (Doc. # 35), both filed on July 28, 2014. Plaintiff Patricia Juanita Wate filed a Response in Opposition to each Motion on September 12, 2014. (Doc. ## 45, 46). With leave of Court, Deputy Kubler and Sheriff Gualtieri each filed a Reply on September 23, 2014. (Doc. ## 54, 55). For the reasons that follow, Deputy Kubler's Motion is granted in part and denied in part, and Sheriff's

---

[1] Although Deputy Kubler has been sued in his individual capacity, Sheriff Gualtieri is sued in his official capacity as Sheriff of Pinellas County, Florida.

Gualtieri's Motion is granted. However, to the extent that the Motions are granted, the relevant counts are dismissed without prejudice, so Wate may file an amended complaint to address the deficiencies described herein.

**I.    <u>Background</u>**

On or about March 17, 2012, James Clifton Barnes traveled to Honeymoon Island with his aunt, Paula Yount. (Doc. # 2 at ¶ 19). Barnes and Yount subsequently entered the water, as it was "Barnes' intention to cleanse his spirit by baptizing himself in the water." (<u>Id.</u> at ¶ 20).

> Once in the water, Mr. Barnes sat on the sea floor up to his chest and, with the assistance of Ms. Yount, submerged himself underwater several times by putting his arms over his head while sitting, swinging backward, going underwater and then returning to his sitting position. He also shouted religious phrases during this process.

(<u>Id.</u>).

During this time, Joseph Tactuk, who was at all relevant times a law enforcement officer with the Florida Department of Environmental Protection, arrived on the scene (<u>Id.</u> at ¶ 21). Yount left the water to speak with Officer Tactuk and explained that Barnes was engaging in a "self-baptism." (<u>Id.</u>). Officer Tactuk advised that Barnes had to get out of the water. (<u>Id.</u> at ¶ 22).

Officer Tactuk proceeded to enter the water to arrest Barnes, who remained seated in the water. (Id. at ¶ 23). The Complaint alleges that Officer Tactuk then "initiated excessive force" in his arrest of Barnes, including striking Barnes in the face with his fists; submerging Barnes in the water with Officer Tactuk's knee in Barnes' back, "thereby depriving Mr. Barnes of oxygen;" putting Barnes in a chokehold; pushing Barnes' "face against the sea floor rocks;" and spraying him with pepper spray. (Id.).

Thereafter, Barnes was handcuffed and removed from the water by his legs. (Id. at ¶ 25). Barnes was "handcuffed in an awkward and painful way, whereby Mr. Barnes['] hands were cuffed together at the center of his back, with his left elbow facing down, his left hand facing up, his right elbow facing up and his right hand facing down, resembling a figure eight." (Id.). Officer Tactuk proceeded to sit on Barnes' chest, "resulting in chest compression and deprivation of oxygen, struck him in his face and head and then sprayed Barnes with pepper spray and/or mace." (Id.). According to the Complaint, bystanders "urged Officer Tactuk to stop beating Mr. Barnes" to which Officer Tactuk responded by threatening to arrest them as well. (Id. at ¶ 26).

Meanwhile, Deputy Kenneth Kubler – of the Pinellas County Sheriff's Office (PCSO) – arrived on the scene in his patrol boat "and proceeded to participate in and continue the use of excessive force, restraint and pain compliance methods against Mr. Barnes that had been initiated by Officer Tactuk." (Id. at ¶ 27). Barnes was having "difficulty breathing, was spewing a large amount of blood from his mouth with every breath and was barely moving." (Id. at ¶ 28). Nevertheless, Deputy Kubler deployed his Taser on Barnes several times, "until Mr. Barnes was unconscious, not moving or breathing and was blue in color." (Id.).

The Complaint further provides that Officer Tactuk and Deputy Kubler failed to render emergency aid. (Id. at ¶ 29). Specifically:

> [U]pon recognizing that Barnes was unable to breathe, Deputy Kubler undertook to retrieve first aid equipment from his Marine Patrol boat, which placed Mr. Barnes in a zone of risk by increasing the risk of harm to Mr. Barnes when [Officer Tactuk and Deputy Kubler] failed to utilize available first aid equipment, and by inducing third parties who would have otherwise rendered aid to forebear from doing so. [Officer Tactuk and Deputy Kubler] failed and refused to administer any respiration assistance to Mr. Barnes, despite having a "barrier device," which allowed for efficient and safe respiration assistance of Mr. Barnes, even if he had a communicable disease.

(Id.). On March 19, 2012, Barnes was pronounced dead as a result of asphyxia, blunt trauma, and restraint. (Id. at ¶ 30).

Wate served the agency Defendants[2] with a "Notice of Claim" dated January 30, 2014, pursuant to Florida Statute § 768.28(6). (See Doc. # 2-1). Wate then filed a seventeen-count Complaint in the Sixth Judicial Circuit (Pinellas County), Florida, on March 19, 2014.[3] (See Doc. # 2). The Complaint includes claims brought under 42 U.S.C. § 1983 for violations of the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution; Title III of the Americans with Disabilities Act; and Florida statute and common law. (Id. at ¶¶ 2, 194). Deputy Kubler and Sheriff

---

[2]   The Court notes that Wate's Complaint lists PCSO, the Florida Department of Environmental Protection Law Enforcement, and the Florida Fish and Wildlife Commission as agency defendants. However, following the mediation in this matter, PCSO is the only remaining agency Defendant.

[3]   Sheriff Gualtieri argues that Wate prematurely filed her Complaint by not waiting the 90 days from the date of the "Notice of Claim" – January 30, 2014 – pursuant to Fla. Stat. § 768.28(6)(d). However, as noted in Wate's Response (Doc. # 46 at 25), this is not "fatal" to Wate's action. See Williams v. Henderson, 687 So.2d 838, 839 (Fla. DCA 1996) (holding that the filing of a complaint before the statutory waiting period "is not fatal to [plaintiff's] action") (citing Hattaway v. McMillian, 903 F.2d 1140 (11th Cir. 1990) and Fitzegerald v. McDaniel, 833 F.2d 1516 (11th Cir. 1987)).

Gualtieri[4] each filed a Motion to Dismiss on filed on July 28, 2014. (Doc. ## 34, 35). Wate filed a Response in Opposition to each Motion on September 12, 2014. (Doc. ## 45, 46). Finally, with leave of Court, Deputy Kubler and Sheriff Gualtieri each filed a Reply on September 23, 2014. (Doc. ## 54, 55).

## II.   <u>Deputy Kubler's Motion to Dismiss</u>

The Complaint includes two causes of action that pertain to Deputy Kubler; specifically, Count XI alleging violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 and Count XV alleging "deliberate indifference to serious medical needs."[5] (<u>See</u> Doc. # 2 at 32, 46). However, in her Response, Wate "concedes that as to Deputy Kubler, the constitutional violations alleged involve only the Fourth Amendment (related to unlawful arrest and excessive force) and the Fourteenth Amendment (related to the deliberate

---

[4]   Officer Joseph Tactuk was also listed as an individual defendant in this case. However, following the mediation of this matter, Officer Tactuk has been dismissed from the action.

[5]   Wate's caption of this claim also includes "Cruel and Unusual Punishment." (Doc. # 2 at 46). However, there is no reference to this theory in the body of the claim (<u>See</u> <u>Id.</u> at ¶¶ 185-92), and Wate's Response refers only to "deliberate indifference to medical needs" (Doc. # 45 at 2 n.1).

indifference to medical needs . . .)." (Doc. # 45 at 2 n.1). Therefore, the Court limits its analysis to those theories.

### A.   **Failure to State a Claim**

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint.  Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true."). However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(internal citations omitted). Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

In accordance with <u>Twombly</u>, Federal Rule of Civil Procedure 8(a) calls "for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570). A plausible claim for relief must include "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

### 1. Fourth Amendment: Unlawful Arrest and Excessive Force (Count XI)

Deputy Kubler's Motion to Dismiss argues that there is nothing in the Complaint to suggest that he searched Barnes. (Doc. # 34 at 15). He also provides that "it is undisputed from the facts averred in the Complaint that Barnes was seized before Deputy Kubler arrived on the scene." (<u>Id.</u>). Deputy Kubler argues that nothing in the Complaint even suggests that he even had "any knowledge of the circumstances that led to Officer Tactuk's decision to arrest Barnes and remove him from the water or that those circumstances were, as Plaintiff contends, without any basis for Officer Tactuk to seize or arrest Barnes." (<u>Id.</u> at 15-16). In support of this assertion, Deputy Kubler points to Florida's "fellow officer rule," which provides that events giving rise to probable cause, the

officer may rely on his fellow officer's judgment about probable cause. (<u>Id.</u> at 16 n.5) (citing e.g., <u>Voorhess v. State</u>, 699 So. 2d 602, 609 (Fla. 1997)).

In terms of Wate's excessive force claim, Deputy Kubler argues that Wate's "generic, vague, and unspecific averments concerning Deputy Kubler's allegedly excessive force" are the type of pleading prohibited by courts. (<u>Id.</u> at 17). "Other than the averment that Deputy Kubler deployed his Taser, the allegations against Deputy Kubler in the Complaint stand in stark contrast to the blow-by-blow description of the events that Plaintiff claims Officer Tactuk engaged in." (<u>Id.</u>). Deputy Kubler again provides that the Complaint is devoid of allegations as to "<u>why</u> Deputy Kubler was called to the scene or what he saw before he arrived on the scene." (<u>Id.</u>) (emphasis in original). Deputy Kubler further provides that there is "no controlling authority that establishes that a law enforcement officer has a constitutional duty to intervene to stop another law enforcement officer from making an arrest under the circumstances pleaded in the Complaint." (<u>Id.</u> at 16).

Wate's Response "concedes that as to Deputy Kubler, the constitutional violations alleged involve only the Fourth Amendment (related to unlawful arrest and excessive force)."

9

(Doc. # 45 at 2 n.1). As to her unlawful arrest claim, Wate argues that in "the context of qualified immunity from unlawful arrest, the court examines 'not whether probable cause existed but whether the officer reasonably believed it existed, based upon the information he or she possessed at the time of the incident.'" (Id. at 20) (citing St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002) (internal citations omitted)). Wate further contends that Deputy Kubler cannot rely on the "fellow officer rule" at this stage of the proceedings, arguing that this rule "allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers." (Doc. # 45 at 22) (citing Voorhees, 699 So. 2d at 609).

In support of her excessive force claim, Wate points to several cases (Doc. # 45 at 12-14), predominantly tied to the allegation that "Barnes was having difficulty breathing, was spewing a large amount of blood from his mouth with every breath and was barely moving, yet Deputy Kubler *deployed his Taser on Mr. Barnes several times*, until Mr. Barnes was unconscious, not moving or breathing and was blue in color." (Doc. # 2 at ¶ 28) (emphasis added). Wate further argues that Deputy Kubler inflicted force on Barnes that resulted in "compression asphyxia." (Id. at 11). She provides that

compression asphyxia can result from, for example, officers pressing their weight in the neck and torso of a handcuffed and prone person begging for air. (Id.) (citing Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003)).

Wate's Response also addresses what she describes as "Deputy Kubler attempt[ing] to downplay his own conduct by comparing the allegations against him with the detailed and more numerous claims against Officer Tactuk." (Doc. # 45 at 14). Wate argues that an officer has "an obligation to intervene to prevent or stop the use of excessive force when he witnesses it and is in a position to intervene." (Id. at 15) (citing Harper v. Perkins, 459 F. App'x 822, 827-28 (11th Cir. 2012) ("because all of the Defendants were together and able to intervene at the time the Taser was being discharged, they are not shielded from liability") (citing Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000))).

Deputy Kubler's Reply argues that there is nothing in the Complaint to suggest that Deputy Kubler arrested Barnes or subjected Barnes to "compression asphyxiation." (Doc. # 54 at 4-5). Further, Deputy Kubler's Reply addresses the Taser cases Wate cites to the extent that he states that some of the cases "were decided after the events in this case occurred, and therefore, they cannot constitute 'clearly

11

established' constitutional law in March 2012," when the present events occurred. (Doc. # 54 at 5 n.7). Finally, Deputy Kubler argues that, in the event that the Court finds that Deputy Kubler arrested Barnes, Wate's excessive force claim should fail, because "the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." (Doc. # 54 at 6) (quoting Bashir v. Rockdale Cnty., 445 F.3d 1323, 1332 (11th Cir. 2006)).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. "An arrest is quintessentially a seizure of a person, and therefore subject to the Fourth Amendment's reasonableness requirement." McClish v. Nugent, 483 F.3d 1231, 1238 (11th Cir. 2007).

In addition, "the Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). "Under [Eleventh Circuit] law, however, a claim that any force in an illegal . . . arrest is excessive is subsumed into the illegal . . . arrest claim and is not a discrete excessive force claim." Jackson v. Sauls, 206 F.3d 1156, 1171

12

(11th Cir. 2000); see also Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)(holding that a claim that any force during a false arrest is excessive is subsumed into the false arrest claim itself because damages for false arrest include damages for use of force to effect that false arrest); accord Motes v. Myers, 810 F.2d 1055, 1059 (11th Cir. 1987)("it is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of the damages for the § 1983 violation.").

Although an arrest without probable cause is unconstitutional, "officers who make such an arrest are entitled to qualified immunity if there was arguable probable cause for the arrest . . . i.e., if a reasonable police officer, knowing what [the defendant] knew, could have believed there was probable cause for the warrantless arrest." Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999) (citations omitted). Here, Deputy Kubler was not present when Officer Tactuk began effecting Barnes' arrest. (See Doc. # 2 at ¶¶ 25-27). Instead, Deputy Kubler arrived on the scene after Officer Tactuk had handcuffed Barnes "and dragged [Barnes] from the water by his legs to the water's edge." (Id. at ¶ 25). In other words, the Complaint alleges that

Officer Tactuk had arrested Barnes prior to Deputy Kubler's arrival on the scene. Therefore, Wate has insufficiently alleged that Deputy Kubler executed an arrest of Barnes. Accordingly, the Court turns to Wate's excessive force claim.

Determining whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the "nature of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interest at stake." Jackson, 206 F.3d at 1170-71 (citations omitted). The application of this test requires:

> [C]areful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.

Graham v. Connor, 490 U.S. 386, 396 (1989). In turn, "[u]se of force, must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396). Further, evaluating the reasonableness of the force used requires allowing for "the fact that police officers are often forced to make split-

second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

Given that the Complaint does not allege what information Deputy Kubler had regarding the severity of the alleged crime at issue – to the extent that there was one – the Court looks to the remaining Graham factors in determining whether Wate has sufficiently alleged a Fourth Amendment violation. See Brown v. Sheriff of Orange Cnty. Fla., No. 6:12-cv-1299-ORL-37GJK, 2014 WL 2722350, at *5 (M.D. Fla. June 16, 2014) (citing Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997) (holding that where the officer is unaware of the circumstances that led to the arrest or the alleged crime at issue, the first Graham factor does not support the use of excessive force)).

As to the second factor, construing the facts in the light most favorable to Wate, nothing in the Complaint indicates that Barnes posed "an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. When Deputy Kubler arrived on the scene, Barnes' hands had been cuffed together in the center of his back "in an awkward and painful way." (Doc. # 2 at ¶ 25). Also contemporaneous with

15

Deputy Kubler's arrival, Wate alleges that Officer Tactuk was applying "excessive force and pain compliance methods, including but not limited to, sitting on Mr. Barnes['] chest resulting in chest compression and deprivation of oxygen, [striking] him in his face and head and then spray[ing] Mr. Barnes with pepper spray and/or mace." (Doc. # 2 at ¶ 25).

Further, nothing in the Complaint suggests that Barnes was "actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Nevertheless, Wate alleges, Deputy Kubler "proceeded to participate in and continue the use of excessive force, restraint and pain compliance methods against Mr. Barnes that had been initiated by Officer Tactuk." (Doc. # 2 at ¶ 27). In addition, even though "Mr. Barnes was having difficulty breathing, was spewing a large amount of blood from his mouth with every breath and was barely moving . . . Deputy Kubler deployed his Taser on Mr. Barnes several times, until Mr. Barnes was unconscious, not moving or breathing and was blue in color." (Id. at ¶ 28).

In addition to the factors set forth in Graham, the Court's analysis draws support from the Eleventh Circuit's decision in Oliver v. Firorino, 586 F.3d 898 (11th Cir 2009). In Oliver, the Court affirmed the district court's decision

rejecting qualified immunity at the summary judgment stage, finding:

> Tasering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the plaintiff – including [T]asering [plaintiff] while he was writhing in pain on the hot pavement and after he had gone limp immobilized – was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances.

Id. at 908. The Eleventh Circuit stressed that the deceased "was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee." Id. Here, the Complaint provides that Barnes had been handcuffed behind his back at the time Deputy Kubler deployed his Taser "several times." (See Doc. # 2 at ¶¶ 25-28).

Wate's argument that Deputy Kubler failed to intervene appears unmoving at this stage of the proceedings. First, as alleged, the facts seem to demonstrate that Deputy Kubler was not present during the majority of Officer Tactuk's conduct. Rather, the facts alleged indicate that Deputy Kubler arrived on the scene and "proceeded to participate in and continue the use of excessive force, restraint and pain compliance methods . . . that had been initiated by Officer Tactuk."

(<u>Id.</u> at ¶ 27). In other words, it is not apparent whether a "collective beating" occurred as Wate alleges in her Response. (<u>See</u> Doc. # 45 at 16-17). Further, there is no reference to Wate's "failure to intervene" argument in Count XI of the Complaint. (<u>See</u> Doc. # 2 at 32-34).

Nevertheless, the Court finds that Wate has sufficiently alleged that Deputy Kubler violated Barnes' Fourth Amendment rights by subjecting Barnes to excessive force; namely, by deploying his Taser "several times" on Barnes, who was handcuffed behind his back in a "figure eight." (<u>Id.</u> at ¶¶ 25, 29).

### 2. <u>Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs (Count XV)</u>

Deputy Kubler's Motion to Dismiss argues that the Eighth Amendment doesn't apply to the present case and that "the Complaint does not appear to state an independent cause of action under the Fourteenth Amendment." (Doc. # 34 at 9-10). Deputy Kubler's Reply stresses this argument and provides that the Court should dismiss Count XV with prejudice because permitting amendment would be futile. (Doc. # 54 at 1-2). Deputy Kubler contends that, to the extent that Wate infers deliberate indifference from Deputy Kubler's failure to use the emergency equipment he retrieved, this constitutes a

legal conclusion devoid of factual support. (Id. at 3).
Finally, Deputy Kubler argues that his alleged actions do not
rise to the level of "more than mere negligence" and did not
violate a clearly established constitutional right. (Id. at
3-4) (quoting Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir.
2005) (per curiam)).

Wate argues that this claim was properly brought under
the Fourteenth Amendment. She provides that "To prevail on a
deliberate indifference to serious medical need claim,
Plaintiffs must show: (1) a serious medical need; (2) the
defendants' deliberate indifference to that need; and (3)
causation between the indifference and plaintiff's injury."
(Doc. # 45 at 24) (citing Mann v. Taser Int'l, Inc., 588 F.3d
1291, 1306-07 (11th Cir. 2009)). Wate argues that all three
facts are satisfied here given Barnes' physical condition and
failure to render emergency aid via the barrier device. (Id.
at 24-25).

The Eleventh Circuit has held that:

Claims involving the mistreatment of arrestees or
pretrial detainees in custody are governed by the
Fourteenth Amendment's Due Process Clause instead
of the Eighth Amendment's Cruel and Unusual
Punishment Clause, which applies to such claims by
convicted prisoners. However, the applicable
standard is the same; so decisional law involving

19

prison inmates applies equally to cases involving arrestees or pretrial detainees.

Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996) (internal citations omitted).

To establish a claim for "deliberate indifference to a substantial risk of serious harm," a plaintiff must meet both an objective and a subjective standard. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "To satisfy the objective component, the plaintiff must show a deprivation that is, 'objectively, sufficiently serious,' which means that the defendants' actions resulted 'in the denial of the minimal civilized measures of life's necessities.'" Cottrell, 85 F.3d at 1491 (quoting Farmer, 511 U.S. at 834).

In addition to meeting this objective standard, a plaintiff must establish that the defendant had a "sufficiently culpable state of mind." Id. That requisite "state of mind is one of deliberate indifference to inmate health or safety" – "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other." Id. (quoting Farmer, 511 U.S. at 836) (internal quotation marks omitted). However, there is no liability for "an official's failure to alleviate a significant risk that he

should have perceived but did not. . . ." <u>Farmer</u>, 511 U.S. at 838.

Without reaching the objective component, Wate has failed to sufficiently allege that Deputy Kubler had a "sufficiently culpable state of mind" to satisfy the subjective standard. <u>Cottrell</u>, 85 F.3d at 1491 (quoting <u>Farmer</u>, 511 U.S. at 834). In fact, Wate does not address Deputy Kubler's mental state as it pertains to this claim. Therefore, Wate has failed to sufficiently allege a constitutional violation. However, noting that this is her first Complaint, the Courts finds that fairness dictates that Wate be granted leave to file an amended complaint to more sufficiently allege this claim to the extent possible.

**B.   <u>Qualified Immunity</u>**

Deputy Kubler's Motion argues that he is entitled to qualified immunity as to all claims asserted against him. (Doc. # 34). The thrust of that argument has been set forth above, as it pertains to the sufficiency of the allegations included in Wate's Complaint.

As a threshold argument, Wate argues that the qualified immunity determination is better addressed at the summary judgment stage, informed by discovery. (Doc. # 45 at 7)

(citing <u>St. George v. Pinellas Cnty. Sheriff's Office</u>, No. 8:06-cv-213-T-23MSS, 2006 WL 2535050, at *5 (M.D. Fla. Aug. 31, 2006) ("Accepting the allegations in [plaintiff's] complaint as true, the merits of [plaintiff's] claim for excessive force are not appropriately addressed (without the benefits of discovery) by a motion to dismiss.")). In any event, Wate contends that Deputy Kubler's actions violated clearly established law. (<u>See</u> Doc. # 45).

"Qualified immunity protects government officials performing discretionary functions as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Sharp v. Fisher</u>, 532 F.3d 1180, 1183 (11th Cir. 2008) (quoting <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007)). "It is well established that a plaintiff seeking to overcome the defendant's privilege of qualified immunity must show (1) that the officer violated her federal constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted." <u>Douglas Asphalt Co. v. Qore, Inc.</u>, 541 F.3d 1269, 1273 (11th Cir. 2008).

To be entitled to qualified immunity, the government official must first establish that he was acting within his discretionary authority. <u>Dalrymple v. Reno</u>, 334 F.3d 991, 995

(11th Cir. 2003).  If the alleged conduct arises from the discharge of a defendant's discretionary functions, then the burden shifts to the plaintiff to prove: (1) that the facts alleged show that the government official's conduct violates a constitutional or federal right; and (2) that the constitutional or federal right "was clearly established at the time of the violation." Id.  A qualified-immunity inquiry can begin with either prong; neither is antecedent to the other. Pearson v. Callahan, 555 U.S. 223, 236 (2009); see also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011).

A right can be considered "clearly established" if, in light of preexisting law, the unlawfulness of the official's conduct is "apparent." Cooper v. Dillon, 403 F.3d 1208, 1220 (11th Cir. 2005).  Thus, an official is entitled to qualified immunity unless the official has fair warning that his conduct is unlawful. Id. The Eleventh Circuit has identified three categories of fair warning:

> First, . . . whether the federal statute or
> constitutional provision is so clear, and the
> conduct is so bad, that it precludes qualified
> immunity even in the total absence of case
> law.  Second, if the conduct is not bad enough
> that it violates a constitutional provision on
> its face, [a court] look[s] to case law that
> can be applied broadly to a number of factual
> situations.  Third, and finally, if no broad

>case law is applicable, [the court] turns to
>case law precedent that is tied to the facts.

Kesinger v. Herrington, 381 F.3d 1243, 1250 n.6 (11th Cir. 2004).

As stated by the Eleventh Circuit, "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." Lassiter v. Ala. A & M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994). Further, the Eleventh Circuit has warned that "courts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of 'abstract rights.'" Id.; Hunter v. City of Warner Robins, Ga., 842 F. Supp. 1460, 1469 (M.D. Ga. 1994)("Unless it can be said that the state of the law was of such clarity that a reasonable official should have been on notice that his or her challenged conduct was unlawful, that official is entitled to qualified immunity."); Saucier v. Katz, 533 U.S. 194, 201 (2001) (To determine whether qualified immunity applies the Court looks to whether the plaintiff's allegations establish a constitutional

violation, and more significantly, whether such right in question was "clearly established").

Here, it is undisputed that Deputy Kubler was acting within his discretionary authority. (See Doc. # 34 at 12; see Doc. # 45 at 6). Therefore, the Court is left to determine whether Wate has sufficiently alleged that Deputy Kubler's conduct violated a constitutional or federal right and whether that constitutional or federal right was clearly established at the time of the violation.

As explained above, Wate's Fourteenth Amendment claim has been dismissed – albeit without prejudice – for failure to meet the pleading requirements of Fed. R. Civ. P. 8(a). Therefore, the Court declines to address Deputy Kubler's argument that he is entitled to qualified immunity as to the Fourteenth Amendment claim. Wate has, however, sufficiently alleged a violation of Barnes' Fourth Amendment rights. Nonetheless, given the circumstances of this case, the Court finds that the qualified immunity determination is more appropriately addressed later in the proceedings when the Court's analysis may be benefitted by discovery. In the event that Deputy Kubler chooses to raise the defense further in the proceedings, the Court will address the issue of qualified immunity at that juncture.

III. **Sheriff Gualtieri's Motion to Dismiss**

The Complaint includes seven causes of action against Sheriff Gualtieri, in his official capacity as Sheriff of Pinellas County, Florida.[6] Because Wate is suing the Sheriff in his official capacity, it is the functional equivalent of a suit against Pinellas County. See Vineyard v. Cnty. of Murray, 990 F.2d 1207, 1210 n.3 (11th Cir. 1993) (citing Owens v. Fulton Cnty., 877 F.2d 947, 951 n.5 (11th Cir. 1989) ("For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents.")).

Count XIII states a claim under 42 U.S.C. § 1983 for violations of Barnes' constitutional rights under the First, Fourth, Fifth, and Eighth Amendments. (Doc. # 2 at 39). In her Response, however, Wate "concedes that as to the Sheriff, the constitutional violations alleged involve only the Fourth Amendment (related to unlawful arrest and excessive force) and the Fourteenth Amendment (related to the deliberate indifference to medical needs . . .)." (Doc. # 46 at 2 n.1).

---

[6]    Wate's claims against Sheriff Gualtieri list "PCSO" as the Defendant and refer to Sheriff Gualtieri and PCSO interchangeably. For clarity, this memo refers to Sheriff Gualtieri as the Defendant, in accordance with Wate's Response. (See Doc. # 46).

Finally, Wate brings various claims under Florida law based on false arrest, battery, and negligence.[7]

## A.   Constitutional Violations (Count XIII)

Sheriff Gualtieri's Motion to Dismiss argues that Wate has not sufficiently stated a constitutional violation under any of the theories for liability set forth in Monell v. Department of Social Services, 436 U.S. 658 (1978). Specifically, Sheriff Gualtieri contends that "nothing in the Complaint identifies any policy or custom of the Sheriff, let alone an unconstitutional one;" the Complaint is devoid of any suggestion that the conflict at issue was more than an isolated incident or that it reflected a custom; "Plaintif fails to plead any specific lacking policy, any knowledge by the Sheriff, and any other instances other than this one." (Doc. # 35 at 5-7). Further, Sheriff Gualtieri contends that Wate has failed to sufficiently plead a "failure-to-train theory of liability" under Monell. (Id. at 8). The Sheriff provides:

---

[7]   Count XVI of the Complaint stated a violation of the Americans with Disabilities Act, however, that Count has been dismissed with prejudice, pursuant to Wate's Unopposed Motion to Voluntarily Dismiss Count XVI of Plaintiff's Complaint (Doc. # 56), which this Court granted on September 24, 2014 (Doc. # 57).

> Plaintiff's Complaint recites a laundry list of generic claims, including the alleged failure "to train [his deputies] in proper methods of effecting stops and arrests" and "to train [his deputies] in proper methods of conducting non-consensual searches and seizures." Tellingly, the allegedly unconstitutional customs or practices engaged in by the Sheriff are nearly identical to those Plaintiff claims that the other agency defendants engaged in.

(Id. at 8 n.3) (internal citations omitted).

Wate argues that the Complaint sufficiently sets forth a claim under Monell in that it "expressly identif[ies] specific policies or customs of the Sheriff, or lack thereof, that caused Deputy Kubler to commit the constitutional violations at issue." (Doc. # 46 at 10). Specifically, the Complaint alleges that Sheriff Gualtieri:

> Employed a custom of violating its own policies and procedures which resulted in the death of James Clifton Barnes by excessive deadly force and the deliberate indifference to James Clifton Barnes'[] serious medical needs after the use of excessive deadly force described herein, which deprived James Clifton Barnes of his rights secured under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution;

> Alternatively, failed to enact or promulgate sufficient policies or procedures to insure against James Clifton Barnes'[] death by use of excessive deadly force or the deliberate indifference to his serious medical need after the use of excessive deadly force as described herein, which deprived James Clifton Barnes of his rights secured under

28

the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution;

Failed to train their officers in proper methods of effecting stops and arrests of citizens within its jurisdiction;

Failed to train officers in proper methods conducting non-consensual searches and seizures;

Failed to train their officers with regard to the appropriate use of mace, pepper spray and/or Taser devices and appropriate level of force to be used to restrain persons[;]

Failed to train their officers in the proper methods of implementing emergency aid and emergency aid devices, including but not limited [to] CPR and barrier devices, and the appropriate situations to utilize emergency aid and emergency aid devices to resuscitate persons placed in peril by force exerted by law enforcement to achieve restraint of such person;

Failed to properly discipline their officers when guilty of using excessive force on persons taken into custody;

Failed to supervise its officers to avoid or curtail use of excessive force by Deputy Kubler and other PCSO officers, creating a defacto [sic] policy, practice, or custom of excessive force against citizens;

Failed to discipline officers who failed to render aid to persons with serious medical needs, as a result of force exerted by law enforcement thus, encouraging deliberate indifference to the serious medical needs of persons taken into custody by officers;

> Failed to properly train its officers to recognize [emotionally disturbed persons (EDPs)] and to properly train its officers regarding measures and techniques to deescalate encounters with EDPs. Thus, the failure to train its officers on encounters with EDPs resulted in deliberate indifference to the rights of EDP[s] to be free from excessive force during encounters with law enforcement[;] and
>
> Failed to properly train its officers to render first aid to persons placed in peril by law enforcement force exerted against such person with resulting serious medical needs.

(Doc # 2 at 40-42). Further, Wate argues that she has sufficiently stated a claim pursuant to the "failure-to-train theory" by establishing Sheriff Gualtieri's deliberate indifference. (Doc. # 46 at 11). In other words, he "knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." (Id.) (citations omitted). In support of these allegations, Wate's Response points to "numerous warning statements" issued by Taser, which "warned of the cardiac risks associated with Taser devices." (Id. at 15). Sheriff Gualtieri's Reply again criticizes Plaintiff's "cutting-and-pasting an all-inclusive list of generic claims sprinkled liberally with 'and/or' and devoid of factual support." (Doc. # 55 at 2).

In Monell, the Supreme Court concluded that a municipality or local government entity "cannot be held liable under 42 U.S.C. § 1983 on a respondeat superior theory." 436 U.S. at 691. However, "a municipality or other local government may be liable under [§ 1983] if the government body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).

A plaintiff seeking to impose liability on a governmental entity under § 1983 must identify a "municipal 'policy or custom' that caused the plaintiff's injury." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403 (1997); see Ky. v. Graham, 473 U.S. 159, 166 (1985)(stating that "to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation." (internal citation omitted)).

A plaintiff may establish liability pursuant to a municipal policy when "a deliberate choice to follow a course

of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). Alternatively, "to prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991)(quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)).

In her Complaint, Wate fails to provide factual allegations that establish Sheriff Gualtieri's liability by identifying a policy or custom adhered to by its employee – Deputy Kubler - in allegedly depriving Barnes of his Fourth or Fourteenth Amendment rights. Instead, Wate's allegations amount to legal conclusions without the necessary factual support. Although Wate's Response further develops these claims, the Court is constrained to the four corners of the Complaint on a Motion to Dismiss. However, given that this is Wate's first Complaint, fairness dictates that she be granted leave to file an amended complaint.

**B.**   <u>**State Law Claims**</u>

Wate's Complaint also brings five state law claims against Sheriff Gualtieri based on Deputy Kubler's actions (Counts II, IV, VI, VIII, and X). Given that the Court has granted Sheriff Gualtieri's Motion to Dismiss to the extent set forth above, the Court refrains from addressing the state law claims at this juncture. The Court will consider these claims with the benefit of Wate's amended complaint.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Kenneth Kubler's Motion to Dismiss (Doc. # 34) is **GRANTED in part** and **DENIED in part** as set forth above.

(2)   Sheriff Bob Gualtieri's Motion to Dismiss (Doc. # 35) is **GRANTED** to the extent set forth herein.

(3)   Plaintiff Patricia Juanita Wate may file an Amended Complaint on or before **November 3, 2014.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>14th</u> day of October, 2014.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies: All Counsel of Record

33