UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PATRICIA JUANITA WATE,
individually and as
personal representative of
the estate of James Clifton
Barnes, deceased,

        Plaintiff,

v.                     Case No.: 8:14-cv-1196-T-33TBM

JOSEPH TACTUK, ET AL.,

        Defendants.
_____/

<u>**ORDER**</u>

This matter comes before the Court on Defendant Kenneth Kubler's Motion for Summary Judgment, which was filed on August 31, 2015 (Doc. # 124). Plaintiff Patricia Juanita Wate filed a response on September 30, 2015 (Doc. # 129). Kubler thereafter filed a reply on October 14, 2015. (Doc. # 136). The Motion for Summary Judgment is ripe for review. For the reasons that follow, this Court denies the Motion.

**I.**    <u>**Background**</u>

The instant action was originally filed in the Sixth Judicial Circuit, in and for Pinellas County, Florida on March 19, 2014. (Doc. # 1 at ¶ 1). Thereafter, the action was removed to this Court on the basis of federal question

1

jurisdiction. (Id. at 1). The original Complaint named Joseph Tactuk, Kenneth Kubler, Bob Gualtieri, in his official capacity as Sheriff of Pinellas County, Florida, the Florida Department of Environmental Protection, and the Florida Fish and Wildlife Conservation Commission as defendants. (Doc. # 2 at 1). Following Court-ordered mediation, the case settled as to Tactuk, the Florida Department of Environmental Protection, and the Florida Fish and Wildlife Conservation Commission. (Doc. ## 27, 38).

However, the case remained pending against Kubler and Sheriff Gualtieri. (Doc. # 38). With leave of Court, Wate filed a Second Amended Complaint on March 10, 2015. (Doc. # 89). On June 9, 2015, the parties moved to bifurcate the claims against Sheriff Gualtieri and to stay the bifurcated claims. (Doc. # 104). The Court bifurcated the claims against Kubler from those against Sheriff Gualtieri; a new case was opened for the claims brought against Sheriff Gualtieri and stayed pending the outcome of the case against Kubler. (Doc. # 105). The case against Sheriff Gualtieri is Case Number 8:15-cv-1386-T-33TBM. Thereafter, and with leave of Court, Wate filed a Fourth Amended Complaint on July 10, 2015, which brings 4 counts:

Count I——Battery/Excessive Force (Against the PCSO);

2

Count II—Violation of the Fourth Amendment (Against Deputy Kubler);
Count III—Violation of the Fourth Amendment (Excessive Force/Multiple Taserings Against PCSO); and
Count IV—Violation of the Fourth Amendment, Failure to Train/Tasering/Positional Asphyxia (Against PCSO).

(Doc. # 113 at 8, 10, 13, 16).

Kubler now moves for summary judgment on the grounds that he is entitled to qualified immunity (Doc. # 124). The facts are recounted below.

## A. **Before Kubler Arrives**

In the morning of Saturday, March 17, 2012, James Barnes, decedent, went with his aunt, Paula Yount, to Honeymoon Island State Park. (Doc. # 129-8 at 5:23-6:5). Barnes and Yount then walked up the beach before getting into the water, whereupon Yount helped Barnes perform a baptismal ritual. (Doc. # 129-8 at 14:25-16:11, 17:3-21:7).

Barnes' actions during the baptismal ritual drew the attention of Tactuk. (Doc. # 134 at 9:1-10:22). Tactuk arrived at the spot on the beach where Barnes and Yount were located and initially stayed on his four wheel ATV. (Doc. # 129-2 at 4:1-6). At some point, Tactuk got off of his ATV, entered the water, and engaged in physical contact with Barnes, which included punches and placing Barnes in a chokehold. (Doc. # 129-4 at 18:24-43:12). As Tactuk continued to try to handcuff

3

Barnes, "every breath that [Barnes] was taking was just a volcano of blood and fluid, every breath." (Doc. # 130 at 16:2-4). During the altercation, Tactuk pepper sprayed Barnes (Doc. # 124-11 at 1), sent a radio transmission requesting aid (Doc. # 134 at 34:5-35:15), and handcuffed Barnes (Doc. # 124-8 at 24:12-14, 25:19). Approximately 7 minutes passed between when Tactuk first signaled for help and when Kubler arrived. (Doc. # 124-2, D. Connollay Aff. at 1, 13).

### B.   <u>Kubler Arrives</u>

When Kubler arrived on the scene, Barnes was already handcuffed with one hand pulled behind his head and the other pulled behind his back, somewhat resembling a figure eight. (Doc. # 130 at 33:19-34:3). As Kubler walked up to where Barnes and Tactuk were on the beach, Barnes' legs were kicking intermittently and Tactuk was sitting on Barnes' stomach. (Doc. # 129-5 at 34:14-16, 35:1-6). Except for the non-constant leg kicking, Barnes was not moving in any other fashion. (Doc. # 129-5 at 33:7-36:3). When Kubler actually reached Barnes and Tactuk, Kubler begun speaking with Tactuk. (Doc. # 129-5 at 35:18-24). Although Kubler was unsure of whether Barnes was handcuffed when he first arrived, Kubler asked, and was told by, Tactuk that Barnes was handcuffed. (Doc. # 135 at 32:12-24). Tactuk also told Kubler that Barnes

4

had been pepper sprayed. (Doc. # 124-8, K. Kubler Dep. Tr. at 39:22-23). During this conversation, Barnes was not moving. (Doc. # 129-5 at 35:25-36:3).

Tactuk then got off of Barnes' stomach and rolled Barnes onto his stomach with the assistance of Kubler. (Doc. # 129-5 at 36:6-9). Tactuk placed his knee onto Barnes' back and started to punch Barnes, after which Tactuk told Kubler, who was standing next to Barnes at this point, to tase Barnes. (Doc. ## 129-5 at 36:11-17; 130 at 34:17-19); cf. (Doc. ## 129-7 at 20:8-21:2; 130 at 32:13-23 (stating "the sheriff deputy [i.e., Kubler] just basically kind of standing there with a knee on the small of Mr. Barnes' back trying to subdue his legs or his – keep him down")).

A different eyewitness testified at his deposition that Barnes was already face-down, laying on his stomach, when Kubler arrived. (Doc. # 131 at 42:3-8). According to this eyewitness, Kubler walked up to where Barnes was laying, pulled out his Taser, and put a boot on Barnes' buttocks. (Doc. # 131 at 42:8-9). Barnes was laying on the beach, with Kubler and Tactuk next to him, and would occasionally raise up by arching his back. (Doc. # 131 at 42:9-43:1, 13-14). According to this eyewitness, Barnes' legs were not moving and Kubler, other than placing a boot on Barnes' buttocks,

did not try to control Barnes' lower extremities. (Doc. #
129-2 at 18:21-19:7).

Another eyewitness testified during his deposition that
after Kubler and Tactuk rolled Barnes onto his stomach, Tactuk
"got on top of Barnes' back and pulled up Mr. Barnes' right
arm, and stared punching him in the side of the face . . . ."
(Doc. # 129-4 at 48:7-12). Other than the movement of Barnes'
legs, Barnes was "wiggling [his left arm] back and forth."
(Doc. # 129-4 at 48:20-23). Tactuk then dropped Barnes' right
arm, switched to holding Barnes' left arm, and resumed
punching Barnes in the face, this time on the other side of
the face. (Doc. # 129-4 at 48:25-49:1-3); see also (Doc. #
129-1 at 29:7-30:10) (stating Barnes was not moving before
Tactuk hit Barnes 3 times in the head).

Kubler then warned Barnes to stop or be tased. (Doc. #
129-4 at 49:15-19); see also (Doc. # 124-8, K. Kubler Dep. at
84:6-8) (stating "I'm telling Mr. Barnes . . . just lay there,
just quit resisting and just lay there"). At this point in
time, Barnes' legs are still moving "[u]p and down like a
fish." (Doc. # 129-4 at 49:20-50:7); but see (Doc. ## 132 at
39:10-14 (stating Barnes was not moving before being tased);
133 at 33:12-18 (same)).

Kubler shot the probes of the Taser into Barnes' back right side. (Doc. ## 129-2 at 21:17-23; 129-4 at 51:7-11). "These probes are connected to the [T]aser gun by high-voltage insulated wire. When the probes make contact with the target, the [T]aser gun transmits electrical pulses along the wires and into the body of the target . . . ." Oliver, 586 F.3d 898, 903 (11th Cir. 2009) (quoting Draper v. Reynolds, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004)) (internal quotation marks omitted); see also (Doc. # 135 at 87:10-25). Kubler tased Barnes 5 times that day. (Doc. # 124-11).

As recorded by the Taser's internal data log, the Taser was first deployed at 12:43:35 for 5 seconds. (Doc. # 124-11 at 3). With the Taser's activation, Barnes' legs went stiff and he stopped moving. (Doc. # 129-4 at 51:13-16). Once the Taser cycled off, Barnes laid still for a second, resumed his aforementioned leg kicking, and Tactuk resumed punching Barnes in the face. (Doc. # 129-4 at 51:16-19); cf. (Doc. # 129-2 at 23:9-20) (stating Barnes was not moving after the first activation of the Taser).

Kubler activated the Taser again at 12:43:49 for 3 seconds. (Doc. # 124-11 at 3). Barnes went stiff, stopped moving, and then started kicking his legs again. (Doc. # 129-4 at 51:21-25). "[T]hen all of a sudden, [Barnes] stopped

kicking, stopped moving, [and] stopped doing everything."
(Doc. # 129-4 at 51:25-52:1).

Nevertheless, Tactuk punched Barnes in the face again.
(Doc. # 129-4 at 52:2-3). Barnes was not moving but Kubler
again activated the Taser at 12:44:20 for 5 seconds. (Doc. ##
129-4 at 52:6-11; 124-11 at 3). Tactuk continued to yell
"[q]uit resisting." (Doc. # 129-4 at 52:13-14). Kubler also
said to quit resisting. (Doc. # 124-8, K. Kubler Dep. at
96:19-23) (stating "all I wanted was [for] Mr. Barnes to quit
thrashing around. Quit moving. Just lay there. . . . Every
time I made a deployment or activation I would, again, re-
emphasize, just lay there, man."). Barnes, not moving, was
tased by Kubler——yet again——at 12:44:43 for 4 seconds. (Doc.
## 129-4 at 52:13-17). Although an eyewitness recounts only
4 activations of the Taser, (Doc. # 129-4 at 53:2-5), the
Taser's data log shows Kubler tased Barnes still again——for
a fifth, and final time——at 12:45:17 for 5 seconds. (Doc. #
124-11 at 3). The 5 activations of the Taser occurred over
approximately a 1-minute-47-second period of time. See (Doc.
# 124-11 at 3).

After the last activation of the Taser, things became
"kind of quiet . . . for a little while." (Doc. # 129-1 at
25:21-24). Barnes remained faced-down and handcuffed with

8

Tactuk on Barnes' back until an eyewitness approached Kubler and Tactuk to tell them to remove the handcuffs because Barnes was not breathing. (Doc. # 129-1 at 26:1-31:15). The handcuffs were removed, Barnes was rolled over, and chest compression started. (Doc. # 129-1 at 31:12-34:25). Barnes died two days later in a hospital. (Doc. # 124-5 at 31).

## II. **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing

the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response

consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

"A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004). "Qualified immunity affords complete protection to government officials sued individually," Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012), except in cases where "the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002); see also Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

"[T]he official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." Crosby, 394 F.3d at 1332. Wate concedes Kubler was performing a discretionary function. (Doc. # 129 at 22). Thus, Wate "bears the burden of demonstrating that [Kubler] is not entitled to qualified immunity," Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004), which she concedes (Doc. # 129 at 22).

This Court follows a two-part analysis in determining whether qualified immunity applies. Vinyard, 311 F.3d at 1346. The first part asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002)) (internal quotation marks omitted) (alteration in original). The second part asks "whether the right was clearly established." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted). Courts have discretion to decide the order in which to address the two parts. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Nevertheless, "[b]oth elements must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

12

A.    **Constitutional Violation**

1.    **Legal Standard**

Wate "must establish qualified immunity is not appropriate because the facts when viewed in the light most favorable to [her] show that [Kubler] violated a constitutional right." Benson v. Gordon Cty., 479 Fed. Appx. 315, 317 (11th Cir. 2012) (citing Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005)). "At summary judgment, [the Court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) (citing Vinyard, 311 F.3d at 1347-48 as "evaluating, at summary judgment, the allegedly excessive force under the facts as described by the plaintiff, notwithstanding the defendant-officer's different version of events").

Although "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . .," it remains that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in

the course of an arrest." Lee, 284 F.3d at 1197. "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tolan v. Cotton, 134 S.Ct. 1861, 1865-66 (2015) (internal citation and quotation marks omitted).

In determining reasonableness, a court "look[s] at the fact pattern," McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009), as described by plaintiff, Fils, 647 F.3d at 1288, "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559 F.3d at 1206 (citation omitted). The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). A Court's "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments——in circumstances that are tense, uncertain, and rapidly evolving——about the amount of force that is necessary in a

14

particular situation." Id. (quoting Graham, 490 U.S. at 396-97) (internal quotation marks omitted).

In conducting this balancing inquiry, a court evaluates several factors, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1305-06 (11th Cir. 2009) (quoting Graham, 490 U.S. at 396). Other factors include "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (quoting Lee, 284 F.3d at 1197-98). The need-for-force criterion "is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198. Because "[t]he constitutional test for excessive force is necessarily fact specific," Terrell, 668 F.3d at 1251 (quoting McCullough, 559 F.3d at 1206) (alteration in original), this Court "must still slosh [its] way through the factbound morass of 'reasonableness,'" Id. (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)).

## 2. **Analysis**

15

Taking the facts as described by Wate, the Court now determines whether Kubler's use of force against Barnes was reasonable. Kubler argues he had at least arguable probable cause to believe Barnes committed a battery on a law enforcement officer and was resisting an officer with violence. (Doc. # 124 at 27-28). Assuming without deciding that such was the crime at issue, the Court still finds that Kubler used excessive force. Under the facts as recounted by Wate, Barnes was face-down, handcuffed, straddled by Tactuk, intermittently kicking his legs, arching his back, and wiggling one of his arms while being punched in the face by Tactuk. (Doc. ## 129-4 at 48:7-12, 48:20-49:3; 130 at 33:19-34:3; 135 at 32:12-24). Nevertheless, Kubler felt it necessary to tase Barnes. Under Draper, 369 F.3d 1270, Kubler's initial activation of the Taser may have been reasonable.

But Kubler did not stop at one activation of the Taser. Rather, Kubler activated the Taser again, with Tactuk hitting Barnes in the face between the first and second Taser activations. (Doc. # 129-4 at 23:9-20). After the second round of tasing, Barnes stopped moving. (Id. at 51:25-52:1); cf. (Doc. # 129-2 at 23:9-20) (stating Barnes was not moving after the first activation of the Taser). Kubler continued on,

16

though. Kubler activated the Taser for a third, then a fourth, and, finally, a fifth time. (Doc. # 124-11 at 3). In all, this sequence of repeated tasing spanned a 1-minute-47-second period of time. (Id.). Barnes died two days later. (Doc. # 124-5 at 31).

In light of the facts as presented by Wate, this Court finds Kubler's use of force unreasonable. Although Kubler's use of force initially may have been reasonable, the calculus of reasonableness produces a different outcome when one considers that Barnes stopped moving after the second Taser activation. Repeatedly tasing a handcuffed suspect who has stopped moving after the application of force is unreasonable.

Kubler argues Eleventh Circuit precedent foreclosures any argument that "Kubler's first use of the Taser was constitutional . . ., but that the subsequent Taser activations were constitutionally deficient." (Doc. # 136 at 9 n.28). According to Kubler, the "Eleventh Circuit expressly rejected this argument in [Buckley v. Haddock, 292 Fed. Appx. 791, 795-96 (11th Cir. 2008)]." (Id.). Kubler's reliance on Buckley is misplaced.

In relevant part, the court in Buckley stated:

> While conceding that a single use of the taser might
> arguably have been reasonable, the district court
> nevertheless concluded (and Plaintiff argues) that
> the other applications of the taser were grossly
> disproportionate and unnecessary, especially given
> that the arrest had been "fully secured" and given
> that backup was en route to assist in moving
> Plaintiff to the patrol car.
>
> We disagree. Never was Plaintiff fully secured
> until after the second officer arrived.

Id. at 795. As can be seen, the court did not reject the
notion that continued application of force might turn from
reasonable to unreasonable. Rather, the Buckley court
rejected the argument that the other applications of the Taser
were unreasonable because of the facts in that case. Thus,
Buckley shows that whether continued application of force
turns from reasonable to unreasonable is fact specific.

Furthermore, Kubler's argument ignores a case relied on
by Wate: Oliver, 586 F.3d at 906. The Oliver court said, in
relevant part,

> In this case, appellee has conceded that when
> Oliver struggled to free himself from Officer Burk
> in the street, he at least arguably placed himself
> and Officer Burk in some danger, and therefore,
> under the rationale of Draper, the use of an
> initial, single Taser shock to calm the suspect may
> have been justified.
>
> Here, however, the force used against Oliver did
> not end there. The officers did not merely shock
> Oliver once and then attempt to engage him [or]
> arrest him . . . .

Id. After recounting the officer's repeated use of the Taser, the Oliver court stated that the "justification for the repeated use of Taser force, at least beyond an initial Taser shock, was minimal." Id. Thus, the Eleventh Circuit has previously analyzed whether continued applications of a Taser turn from reasonable to unreasonable. In sum, Kubler's argument on this point is unpersuasive.

Kubler also cites to other eyewitnesses' testimony, as well as his own and that of Tactuk, as support for the contention that Barnes was moving during the entirety of the tasing sequence, even after the final Taser activation. (Doc. # 136 at 6 n.23). Kubler further argues that "Plaintiff repeatedly conflates a witness testifying to whether he or she heard or saw something with whether the event, in fact, transpired." (Id.). Both arguments are unpersuasive.

As an initial matter, the conflict in testimony regarding whether Barnes was moving in between Taser activations, and even still after the last activation, presents a genuine issue of material fact. Compare (Doc. ## 124-8, K. Kubler Depo. at 96:15-97:2, 100:5-102:10; 124-8 J. Tactuk Dep. at 55:18-24, 90:6-10), with (Doc. ## 129-2 at 23:7-20; 129-4 at 51:7-52:9). Such "contradiction presents a classic swearing match, which is the stuff of which jury

trials are made." Feliciano v. Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013).

Further, when taken together, Kubler's arguments ask the Court by implication to credit Kubler's rendition of the event over Wate's version. However, to do so would be contrary to binding precedent. See Fils, 647 F.3d at 1288; Vinyard, 311 F.3d at 1347-48. The Supreme Court last year reiterated that a court cannot weigh the evidence presented, nor resolve issues of fact in favor of the moving party, at summary judgment. Tolan, 134 S.Ct. at 1866-68. What the Supreme Court stated in Tolan is instructive here:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

Id. at 1868. This Court will not "neglect[] to adhere to [that] fundamental principle" by accepting Kubler's version of events over Wate's.

### B.   Clearly Established

#### 1.   Legal Standard

Furthermore, Wate "must also show that the right involved was clearly established at the time of the putative misconduct." Benson, 479 Fed. Appx. at 317 (quoting Terrell, 668 F.3d at 1250) (internal quotation marks omitted). "The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right." Bussey-Morice v. Gomez, 587 Fed. Appx. 621, 627 (11th Cir. 2014) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" Tolan, 134 S.Ct. at 1866 (quoting Hope, 536 U.S. at 741) (alterations in original). "[T]he touchstone of qualified immunity is notice." Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003); see also Saucier, 533 U.S. at 202.

The Eleventh Circuit has established two methods for determining whether the right in question was clearly established at the time of the alleged misconduct. Fils, 647 F.3d at 1291. Under the first, "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish

the law." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc)). But, Wate does not rely on this approach; rather, Wate relies on the second method.

The second method, termed the obvious-clarity method, "involves evaluating the officer's conduct and deciding whether the officer's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law on point." Bussey-Morice, 587 Fed. Appx. at 627 (quoting Fils, 647 F.3d at 1291) (alteration in original) (citation and internal quotation marks omitted). This method "recognizes that although concrete facts are typically necessary to provide an officer with notice of 'the hazy border between excessive and acceptable force,' when an officer's conduct is 'so outrageous that it clearly goes "so far beyond" these borders, qualified immunity will not protect him . . . .'" Id. (quoting Fils, 647 F.3d at 1291-92).

The obvious-clarity method "offers a narrow exception to the general rule that only case law and specific factual scenarios can clearly establish a constitutional violation," however, it "is a difficult one to meet." Id. at 627-28.

Nevertheless, "qualified immunity will be denied if the preexisting law '[made] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue.'" Montero v. Nanlal, 597 Fed. Appx. 1021, 1026 (11th Cir. 2014) (quoting Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010)).

### 2. Analysis

Wate relies on Oliver, 586 F.3d 898, as authority clearly establishing that "the multiple use of a Taser on a suspect who is already subdued and not posing an immediate threat to the officers is excessive force under the Fourth Amendment." (Doc. # 129 at 28). For his part, Kubler argues Oliver is distinguishable and that Wate ignores a handful of cases, which Kubler contends support his use of force. (Doc. # 136 at 7, 9).

The obvious-clarity method does not require case law and specific factual scenarios to clearly establish a constitutional violation, though. Bussey-Morice, 587 Fed. Appx. at 627-28. "The question . . . boils down to this: whether it would be clear to every reasonable office, even in the absence of case law, that the force used——[repeatedly tasering Barnes, who was handcuffed and face-down, over a 1-minute-47-second period of time, with the last 3 taserings

occurring after Barnes had stopped moving]——was excessive under the circumstances.

Kubler's arguments on this point are predicated on his rendition of the facts; Kubler even argues that Wate attempts "to minimize" Barnes resistance. (Doc. # 136 at 8). These arguments are unpersuasive for the same reason Kubler's arguments were unpersuasive in determining whether there was excessive force——namely, a court evaluates "the allegedly excessive force under the facts as described by the plaintiff, notwithstanding the defendant-officer's different version of events." Vinyard, 311 F.3d at 1347-48.

Under Wate's version of events, Barnes——handcuffed, laying face-down, and straddled by Tactuk, who punched Barnes in the face before the first and second Taser activations—— stopped moving after the second activation of the Taser. (Doc. # 129 at 13-15) (citing Doc. # 129-4 at 47:21-53:5). Yet, Kubler activated the Taser three more times. (Id. at 15) (citing Doc. # 129-4 at 52:1-53:5); (Doc. # 124-11 at 3). In addition, this was not a "split-second decision." As recorded by the Taser's data log, 28 second passed between the second and third Taser activations. (Doc. # 124-11 at 3). In between the third and fourth Taser activations 18 seconds elapsed.

(Id.). And, finally, a full 30 seconds pass between the fourth and fifth Taser activations. (Id.).

Given Wate's version of the facts, the Court determines it would be clear to a reasonable officer that tasing a person, who is laying face-down and handcuffed, 5 times, with the last 3 tases occurring after the person stopped resisting, is excessive. Oliver, 586 F.3d at 906 (holding that the repeated discharge of a Taser on an incapacitated suspected is excessive force); Hadley v. Gutierrez, 526 F.3d 1324, 1333-34 (11th Cir. 2008) (stating "a handcuffed, non-resisting [suspect's] right to be free from excessive force was clearly established in February 2002"); see also Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015) (characterizing Oliver's holding).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Kenneth Kubler's Motion for Summary Judgment (Doc. # 124) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 24th day of November, 2015.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE